## Case No. 15,971.

### UNITED STATES v. ORTEGA.

[4 Wash. C. C. 531.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1825.

PROOF OF FOREIGN LAWS—PAROL EVIDENCE—ASSAULT ON FOREIGN MINISTER.

1. The unwritten law of a foreign government may be proved by parol evidence, but the written law can only be proved by itself.

[Cited in Lattourett v. Cook, 1 Iowa, 1; State v. Behrman, 114 N. C. 797, 19 S. E. 223.]

2. What constitutes an assault?

[Cited in Kirland v. State, 43 Ind. 150.]

3. Upon an indictment for an assault committed on the charge d'affaires of a foreign government, proof that the person assaulted is received and recognized by the executive of the United States, is conclusive as to his public character; and that he is entitled to all the immunities of a foreign minister.

[Cited in U. S. v. Benner, Case No. 14,568; Ex parte Baiz, 135 U. S. 424, 10 Sup. Ct. 859.]

[Cited in People v. Jones. 24 Mich. 226.]

4. If a foreign minister commits the first assault, he forfeits his immunity so far as to excuse the defendant for returning it.

5. It is no defence upon such indictment that defendant was ignorant of the public character of the minister.

[Cited in U. S. v. Benner, Case No. 14,568.]

The defendant was indicted for an assault upon the person of Mr. Salmon, the Spanish charge d'affaires, and for infracting the law of nations by committing violence upon his person. These charges were contained in two separate indictments, both of which were tried at the same time. The facts of the case, as proved by Mr. Salmon (who presented himself to the court as a voluntary witness), were as follows. On the night of the 17th of September last, whilst the witness was returning from the circus, he heard the steps of some person walking gently behind him. The defendant came up to him, and seizing the breast of his coat, said, angrily: "Mr. Salmon, I am Ortega, you have insulted me, and I seek satisfaction." The answer was. "I have not insulted you, but you now insult me—let me go." "No," replied the defendant, "I have got you now, and I will not let you go, unless you will promise to give me satisfaction, for you have published many falsehoods against me." Mr. Salmon replied, that he had published nothing against him, but in answer to a very insulting manifesto of his against all kings, and especially against his government. He further added: "Is it so long after your arrival that you seek satisfaction for an old offence; and is this the way you demand it? Have you no friend to send on such an errand? You know who I am, and where I

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

live." The defendant, still retaining his hold, Salmon again desired him to let him go, threatening to strike him if he did not. The defendant answered: "You need not strike me, for I shall fight you in another place"; and then inquired if he had any arms about him? Mr. Salmon replied that he had not, for he professed to be a peaceable man. The defendant observed, that he had none either, but that he could easily procure them, if Mr. Salmon would fight. Mr. Salmon answered that he should fight him immediately, if he did not release him. All remonstrances proving fruitless, Mr. Salmon thrust the defendant with the point of his umbrella, which was returned by a blow with another umbrella. The fight continued for some time, when Mr. Salmon, having greatly the advantage, having hold of his cravat with his back fixed against the wall, a Mr. Smith came up, and desired them to separate. Mr. Salmon agreed to release the defendant if he would promise to keep the peace. This, after some hesitation, was promised, and the defendant was released. But almost immediately afterwards the defendant again approached Mr. Salmon in a menacing attitude, with one of his arms raised. Mr. Smith immediately interposed, and after reminding the defendant of his promise, told him, that if he was determined to have a fight, he must first fight him. This put an end to the affray; and the parties separated. Another witness, Mr. Wallace, stated, that he passed the parties, who were talking in Spanish, with apparent ill blood, and that he did not observe the defendant to have hold of Mr. Salmon. He stopped at a short distance from them, and remained till the fight was over. To prove the public character of Mr. Salmon, the following evidence was given. An official letter from Mr. Anduaga, the Spanish minister, just previous to his departure from the United States, addressed to the secretary of state of the United States, dated 15th of March, 1823, informing him that he had appointed Mr. Salmon charge d'affaires of his Catholic majesty in the United States; and another letter to the same effect, from the same person. addressed to Mr. Salmon. A letter from the secretary of state, dated the 20th of the same month. addressed to Mr. Anduaga, in answer to the above, recognizing the character of Mr. Salmon, and stating he should with pleasure correspond with him. Two letters from the secretary of state, dated the 4th of April, 1823, and the 24th of September last, addressed to Mr. Salmon as charge d'affaires; the latter being in answer to one addressed to the department complaining of the outrage committed by the defendant, in which the secretary regrets the circumstance, and states, in substance, that the public prosecutor would do what was proper on the occasion.

Mr. Brent, the chief clerk in the department of state, was then examined; who de-

posed, that Mr. Salmon was recognized by the president as charge d'affaires, on the retiring of Mr. Anduaga, and was accredited by the secretary of state, who has continued to correspond with him as such, from the departure of Mr. Anduaga, until within a short time past. Mr. Salmon stated upon his examination, that Mr. Anduaga was appointed minister to the United States, under what was termed the constitutional government, which was established on the 9th of March, 1820, and might be said to have terminated about the 1st of October, 1823. To prove that the public character of Mr. Salmon was known to the defendant, two letters from the latter to the former, dated in May, 1824, addressed to him as charge d'affaires, were read. The counsel for the defendant offered to prove, by a witness, the contents of two decrees of the king of Spain, bearing date the 1st and 20th of October, 1823, as well as another called the "Decree of Purification," issued in December, 1824, for the purpose of showing that Mr. Salmon, not having complied with the last decree, ceased to be a minister of the Spanish king. The court refused to permit such evidence to be given, stating that, although the unwritten law of foreign countries may be proved by witnesses, the written law could be proved only by itself. To prove that a charge d'affaires is a public minister, entitled to the same privileges, immunities, and protection, and that it is sufficient, though he has no letters of credence, if he be received by the government to which he is sent, and personally presented, the district attorney referred to 8 Merl. Repert. p. 238. He contended that the public character of Mr. Salmon was abundantly proved.

The counsel for the defendant insisted, (1) That the alleged assault by the defendant was not sufficiently proved, the evidence of Mr. Wallace upon that point being opposed to that of Mr. Salmon. That even if it were not, it is no assault for one person gently to lay his hand upon another, or to take him by the coat, as Mr. Salmon states was done in this case. That the first assault was committed by Mr. Salmon, which will justify a battery committed even on a foreign minister; for which was cited U. S. v. Liddle [Case No. 15,598], decided in this court in 1807. (2) That no evidence had been given sufficient to prove that the defendant knew the public character of Mr. Salmon, without which the offence is not made out. For although Mr. Salmon may have been charge d'affaires in 1824, yet the defendant had reason to believe that he was displaced by virtue of the Spanish decrees, particularly that of purification. (3) The minister, Mr. Anduaga, had no authority to appoint Mr. Salmon charge d'affaires; the appointment could be made only by the government of Spain. But if he had the power, still, the official character of that gentleman ceased with the constitutional government, and

could only revive by a new appointment of the king upon his restoration, of which no evidence has been given. They denied that the recognition of his public character by the executive of the United States, was sufficient evidence of his being a minister, and entitled to the immunities of one. Cases cited: Vatt. Law Nat. bk. 4, c. 7, §§ 80–83; Id. c. 8, § 111; 2 Burl. 366; Wicquefort, Ambassadors, 18, 112, 113; Cas. Temp. Talb. 282; 4 Inst. 153; Mart. Law Nat. 198.

The District Attorney, for the United States.

J. R. Ingersoll and S. Chew, for defendant.

WASHINGTON, Circuit Justice (charging jury). This is a prosecution instituted by the United States, for the purpose of vindicating the law of nations and of the United States, offended, as is charged, in the person of a foreign minister, by an assault committed on him by the defendant. It is a case which cannot fail to be highly interesting both to the defendant and to our government. To the former, on account of the punishment which might be the consequence of conviction; and to the latter, because the government of the United States, like that of all civilized nations, is bound to afford redress for the violation of those privileges and immunities which the law of nations confers upon foreign ministers, and which are consecrated by the practice of the civilized world. A neglect, or refusal to perform this duty might lead to retaliation upon our own ministers abroad, and even to war. The case, therefore, from its importance, recommends itself to the gravest attention both of the court and of the jury.

There are two questions for your consideration: (1) Is the charge, that an assault was committed by the defendant upon the person of Mr. Salmon, sufficiently proved? If it be, then (2) Was Mr. Salmon a public minister at the time the assault was made?

1. (After summing up the evidence as before stated, the judge proceeds:) It was argued by the counsel for the defendant, that, to constitute an assault, it must be accompanied by some act of violence. The mere taking hold of the coat, or laying the hand gently upon the person of another, it is said, does not amount to this offence; and that nothing more is proved in this case, even by Mr. Salmon. It is very true that these acts may be done, very innocently, without offending the law. If done in friendship, for a benevolent purpose, and the like, the act would certainly not amount to an assault. But these acts, if done in anger, or a rude and insolent manner, or with a view to hostility, amount, not only to an assault, but to a battery. Even striking at a person, though no blow be inflicted, or raising the arm to strike, or holding up one's fist at him, if done in anger or in a menacing manner, are considered by the law as assaults. It is then

for you to say whether, from the evidence which has been given in the cause, Mr. Salmon was seized, or laid hold of, by the defendant, in kindness and for a justifiable cause, or in anger and with hostile intentions? If the latter, it is an unquestionable case of assault and battery.

It was further argued by the defendant's counsel, that the only witness to prove the assault, is the party who considers himself to have been aggrieved, and therefore, that his evidence ought to be received with great caution, particularly, as another witness, Mr. Wallace, who was present, did not observe the defendant to have hold of Mr. Salmon's coat. It is for the jury to say, whether the evidence of this fact, as stated by Mr. Salmon, is contradicted by Mr. Wallace; and if it be, whose statement is most to be believed; and whether this latter witness, who deposed that he passed the parties in the night and stopped at some paces from them, had it as much in his power to give them correct information in relation to this fact, as Mr. Salmon, who was immediately engaged in the transaction had? If there be no absolute contradiction, the mere circumstance that the testimony given in support of the prosecution is by the party alleged to be aggrieved, ought to have very little influence in the decision of the case. The law makes him a competent witness. He has no interest whatever in the decision of the case; and, if his character be unimpeached, his testimony given in such a manner as not to justify a suspicion of his want of strict veracity, and he stands uncontradicted by other testimony, he is a credible witness, and entitled to be believed. Again, it has been insisted, that, by waving his privilege in becoming a voluntary witness, he has himself violated the law of nations, and his duty to his sovereign. If this be so, that is a matter to be settled by them. We have nothing to do with it. It deprives him neither of his competency, nor of his credibility.

But should the jury feel doubts as to the first assault, on the ground of any discrepance in the evidence, the witnesses all agree that, after Mr. Salmon released the defendant upon his promise to keep the peace, the defendant again approached him in a hostile, or menacing manner, with his arm raised, when a further conflict was prevented by the commendable interposition of Mr. Smith. That this act amounted to an assault admits of not the slightest doubt, and brings the case within the provisions of the twenty-seventh [28th] section of the crime act of 1790 [1 Stat. 118], provided Mr. Salmon was a foreign minister; which is the second point to be considered.

2. Was Mr. Salmon a foreign minister, at the time the alleged offence was committed? The following evidence has been given to prove the public character of this gentleman. (Here the evidence before mentioned was stated to the jury.) The counsel for the defendant have gone into a rigid examination of the credentials of Mr. Salmon. They deny that any thing short of credentials emanating from the sovereign, from some department of his government charged to perform duties of this nature, could constitute him a minister; and, that, even if the appointment of a minister under the constitutional government of Spain was sufficient, it became void by the revolution, which restored the king to his former power, and rendered a reappointment necessary.

If these were questions fit for judicial inquiry and decision, we should say that the appointment of a charge d'affaires by a foreign minister, upon his retiring from the station to which he had been appointed, is usual in practice; and if he be recognized as such by that branch of the government which is authorised to receive ministers, and with which he is to transact the business of his own sovereign, his character of minister is unquestionable. And further, that if, after the constitutional government of Spain terminated, a reappointment, or a recognition, by the king, of the public character of this gentleman were necessary, still, as he is found, after a lapse of about two years, the recognized minister of Spain by our government, we ought to presume that his sovereign has done all that he thought necessary to clothe him with that character.

But the conclusive answer to these arguments is, that these are matters of state, with which courts of justice have nothing to do. The constitution of the United States having vested in the president the power to receive ambassadors and other public ministers, has necessarily bestowed upon that branch of the government, not only the right, but the exclusive right, to judge of the credentials of the ministers so received; and so long as they continue to be recognized and treated by the president as ministers, the other branches of the government are bound to consider them as such. If courts of justice could sit in judgment upon the decision of the executive in reference to the public character of a foreign minister, and by pronouncing him to be unduly appointed, or improperly recognized, deprive him of the privileges of a minister, what an extraordinary anomaly would such an interference present to the world! The individual who should be placed in this predicament, would, for all the purposes of his own, and of this government, be a minister, the representative of his sovereign, authorised to transact the business with which he is charged, and to bind his sovereign, whilst acting in obedience to his orders; and yet, he would be no minister in the view of the judiciary, and, of course, not entitled to the protection due from that character. In other words, a public minister without the privileges and immunities of one. For, notwithstanding this judicial interference, he would still continue to be a minister as long as the president should con-

tinue to recognize him as such; and no judgment of a court of justice could deprive him of that character, although it should withhold from him the sanctity appertaining to it. Besides, if it belong to courts of justice .o meddle with these matters, and looking beyond the acts and conduct of the president, to decide a person recognized by him as a foreign minister, to be no minister, surely that branch of the government ought to possess all the lights to guide their judgment which are possessed by the president, and should consequently be empowered to call for and to expose to public view, the archives of state, and the correspondence of the executive of this nation with foreign nations, in relation to the subject on which the decision is to be made. Yet, who would be wild enough to maintain a proposition so extravagant and absurd?

The principles which have been stated are those which governed this court in U. S. v. Liddle [Case No. 15,598], decided in 1807; in which it was stated, that the certificate of the secretary of state, that the person claiming to be a charge d'affaires, was received and recognized as such by the executive of this government, was the best evidence which could be given of that fact. The only proper inquiry, in short, in cases of this nature is, has the person, claiming to be a foreign minister, been received and recognized as such by the executive of this government? If he has, the evidence of those facts is not only sufficient, but in our opinion, conclusive upon the subject of his privileges as a minister. Such has been the nature of the evidence given in this case.

It now remains only to notice two or three arguments of the counsel, upon which some reliance was placed. It seemed to be supposed by the district attorney, that even if the first assault had been made by Mr. Salmon on the defendant, the blow which was returned would have been an offence under the act of congress. But this is not the opinion of the court. A foreign minister, by committing the first assault, so far loses his privilege, that he cannot complain of an infraction of the law of nations; if in his turn, he should be assaulted by the party aggrieved. This was decided by this court in Liddle's Case.

It was insisted by the defendant's counsel, that it is incumbent on the prosecutor to prove that the public character of Mr. Salmon was known to the defendant at the time this transaction took place. If this position could be maintained, still, as it is shown by the defendant's letters to Mr. Salmon in May, 1824, that he then knew that gentleman to be the Spanish charge d'affaires; if he had afterwards ceased to be so, it lay on the defendant to prove it. Knowing him once to have been entitled to this character, he acted at his peril if it should turn out that that character still continued; or if indeed the reverse should not be proved. But

in point of law, it is immaterial whether the defendant knew that the person assaulted was charge d'affaires or not, and this point also was decided in the case before referred to of U. S. v. Liddle.

As to the Spanish decrees, alluded to by the counsel for the defendant; there is no evidence given of them, and consequently they are not to be noticed by the jury. It is impossible for the court or jury to say whether they do, or do not affect Mr. Salmon.

The jury returned with a verdict finding the defendant guilty.

NOTE. A motion in arrest of judgment was made on the ground that this was a case affecting a foreign minister, and that therefore the circuit court had not jurisdiction. This point was taken to the supreme court upon a pro forma certificate of a division of opinion in this court, and there decided in favour of the jurisdiction. 11 Wheat. [24 U. S.] 467.