## H. O. Rogers *v.* The State.

1. Lost Indictment — Substitution.— The authenticity of a substitute indictment can not be rested on presumption, nor on mere inference from a record-recital that, the original indictment being lost, the court granted leave to substitute it with a copy inspected by the court.   The record must affirmatively verify it as a fact that the substitution was actually made.

2. Land-Forgery — Evidence.— In the trial of appellant for the forgery of a deed purporting to have been signed by one Gritten, it was not error to allow the State to put in evidence, for comparison with the signature alleged to have been forged, certain signatures which purported to be those of Gritten to documents shown to be archives of the General Land Office.

3. SAME.— Nor was it error to admit as evidence for the State an original entry in a record-book of the General Land Office, for the purpose of showing that the land-agency firm of which the defendant was a member made application (anterior to the alleged date of the forgery) for a copy of the original title granted to Gritten. It was not incumbent on the State to confront the defendant with the person who made the original entry upon the record-book. (Hurt, J., dissenting.)

4. SAME — JURISDICTION.— The jurisdictional rulings in the case of *Rogers, Ex parte,* 10 Texas Ct. App. 655, reconsidered and maintained,— which rulings assert the amenability in Texas of a party who here concerts with and aids his accomplice to fabricate in another State a deed purporting to convey land within this State.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. WALKER.

By the minutes of the trial court it appears that an indictment was presented by the grand jury of Travis county on May 23, 1881, against the appellant and H. M. Peck, for forgery. On December 12, 1881, the county attorney filed a written suggestion of the loss of the indictment, and asked leave to substitute it. The next day an entry appears that, "it being shown to the court that the copy submitted by the county attorney is a substantial copy of the original, it is ordered by the court that said leave be granted and said county attorney allowed to substitute said original indictment in this case." The next entry in the transcript is the written "statement" of the county attorney, dated the same day as the preceding order, and alleging that a paper thereto attached and marked exhibit A "is substantially the same as said original indictment which has been lost as aforesaid; wherefore said county attorney asks the court that said exhibit A be received by the court as a substitute for said original indictment." The substitute marked exhibit A bore the clerk's file-mark as of the same date as the county attorney's statement, and no further entry appears with reference to it.

The substitute indictment charged that H. O. Rogers (the appellant) and H. M. Peck, in said county and State, on August 8, 1874, did "unlawfully, willfully, feloniously, without lawful authority, and with the intent to defraud, falsely make and forge a certain false and forged instrument in writing purporting to be the act of another person, to wit, the act of Edward Gritten, which said false and forged instrument in writing being then and there falsely made by the said Rogers and Peck, without lawful authority and with the intent to defraud on the part of the said Rogers and Peck, in such manner that said false and forged instrument in writing would, if the same were true and genuine, have transferred and affected certain property, to wit, a tract of land in the county of Travis and State of Texas, and which said false and forged instrument in writing did then and there relate to and affect an interest in land in the State of Texas, and which said false and forged instrument in writing purports to be a transfer and conveyance of the land aforesaid from the said Edward Gritten to James Leland Hall, and which said false and forged instrument bears date on the 25th day of January, A. D. 1849, and is in words and figures as follows, to wit."

The substitute indictment then sets out *in hæc verba* the written instrument, and a certificate of acknowledgment thereof which bears date January 25, 1849, and purports to be the official act of John P. Kale, county clerk of Polk county, Texas. At the foot of the written instrument appears "Edward Gritten [seal]" as the signature of the maker, and "John Gardner, Henry Miller" as those of subscribing witnesses. Around the signature "Edward Gritten" is a long rubric,— a characteristic scrawl by which in civil-law countries a signature is identified in like manner as a horse by the brand upon him. The maker of the instrument was described as "Edward Gritten of Polk Co., State of Texas," and it

purported, in consideration of $1,000 cash, to convey to " James Leland Hall, of the county of St. Louis and State of Missouri," one league of land in Travis county, described by metes and bounds, but stated to contain twenty-six labors,— a mistake not natural to a man who used a rubric.

The defense filed a plea of former jeopardy, alleging that in March, 1881, the defendant had been put on trial before a jury upon a previous indictment for the forgery of the same instrument set out in the present charge against him. The plea averred fully and specifically the proceedings had upon the former trial; but, for present purposes, they are sufficiently disclosed in the case of *Ex Parte Rogers*, 10 Texas Ct. App. 655. On December 14, 1881, the present cause went to trial on the defendant's pleas of former jeopardy and not guilty. The jury found a verdict of conviction, and assessed defendant's punishment at a term of two years in the penitentiary.

The evidence in this record is prolix, being largely of a circumstantial and complex character, and disclosed by parol and documentary proofs. In so far as it is directly involved in the rulings of this court, it is stated in the opinion. That adduced by the prosecution had for its object, not only the proof of the *corpus delicti*, but the demonstration of a conspiracy by the defendant and others, concerted and partly executed in Travis county, Texas, to manufacture a forged title to a tract of land in said county granted to Edward Gritten by the government of Coahuila and Texas. John Barry Strong, an avowed accomplice and experienced informer on his confederates, was the witness principally relied on to bring home to the defendant a guilty participancy in the fabrication of the instrument set out in the indictment.

After a brief account of himself as a former denizen of Illinois and Missouri, and an incidental allusion to the " dramatic profession " from which he seceded when his

wardrobe was burned in 1858, J. Barry Strong testified that he came to Austin, Texas, in December, 1873, at the instance of a Kansas City man named Jones, who wrote him that Austin afforded good opportunities in the land business, and who referred him to Martin and Rogers at Austin. On the arrival of witness at Austin he found that the land business of Jones, Martin, Rogers and others was the fabrication of transfers for (unlocated) land certificates remaining in the General Land Office at Austin, and by means of the transfers obtaining and utilizing the certificates. Being advised of witness's advent at Austin, Jones met him at the depot and took him to the domicile of Martin, who was a one-eyed Iowa ex-sheriff. Jones and Martin, and a brother of the latter, · were boarding themselves in a house on Pecan street in Austin. Martin's nephew was cooking for them in the old fashioned way with a skillet and oven. At that place the witness was introduced by Jones to the defendant, whom, however, he thought he had previously met at the defendant's office near by. H. M. Peck was with the defendant, and was introduced by him to the witness, who understood that they were "engaged in the land business,— drawing certificates from the Land Office on forged titles." Witness examined some transfers which the defendant had; they were pretty well got up, except, as he remarked to the defendant at the time, they "looked rather fresh for old documents." Defendant talked to witness about the Gritten land and other outstanding titles. It was understood that they were getting up bogus or forged titles to lands, and getting them on record. Peck did not say much. Defendant told witness that Peck was his partner and transacted the business. Witness left Austin in January, 1874. Previous to leaving he had an interview with defendant on an occasion when the latter had just come from the General Land Office, and said he had offered one of his titles and it had

been refused. He was excited. He said Fisher (the chief clerk of the General Land Office) had told him he ought to let the ink dry on his titles before he attempted to use them, and advised him to be careful or he would get into trouble. Defendant then said he was going to quit the certificate business, and go exclusively into getting up titles to dead lands on which taxes were not paid,— an indication that the owners had abandoned or forgotten the lands and were not likely to detect tamperers with the titles. He proposed that witness should go in with him and Peck, and that they would furnish the data for getting up bogus titles and send the same to witness, who should have the titles made outside of the State. To this the witness agreed, and told them that any kind of title-papers they wanted could be made at Chicago. The Gritten transfer was talked of, and field-notes therefor were to be sent to witness, to enable him to make the title. Witness told them to send the field-notes to him at Dallas to care of English, but he got them and the accompanying letter before he left Dallas. Defendant gave witness certain seals, and also a certificate cut out of the archives of the comptroller's office, a list of notaries, and some blanks which he said were obtained from Ham. (See 4 Texas Ct. App. 645, for the case of *Ham* v. *State,* and some account of his operations in Texas as a land forger.) Defendant also furnished witness with a certificate of John P. Kale, county clerk of Polk county, Texas, which the defendant said was a genuine certificate taken from the records of the comptroller's office. Defendant gave witness four seals, which he said Ham had got for him, but that they were made wrong. There were also other seals, which were procured by one Maddox,— a man who subsequently testified for the State, and said that he had lived since 1870 in Travis county and DeWitt. The papers and the four seals were delivered by defendant to witness for use in making forgeries when witness should get to Chicago.

The witness was shown certain seals, and recognized them as the same he had been speaking of. He also identified certain papers as the documents delivered to him by the defendant. It was understood between defendant, witness and Peck, before witness left Austin, that the defendant and Peck were to send him the field-notes of the Gritten league, and witness was to have the bogus deed made at Chicago. A title was to be gotten up for the Gritten league. A title was afterwards got up for it; the title was made in Chicago. Witness identified the deed on which the indictment was based as the "title" of which he was speaking, and said the whole of it was written in Chicago. The name of Gritten was put to the paper by one Thompson; Gritten was not there. The document was got up as a bogus instrument,— a forgery. There is a rubric to the name of Gritten as signed to the forged instrument. Before witness left Austin, the defendant gave to witness a signature which he got by tracing Gritten's signature to the Spanish title in the General Land Office. Defendant gave the signature to witness at Austin for his use in making the forged deed, and it was used in the making of the forged deed at Chicago, as also was the John P. Kale certificate as county clerk of Polk county. A man named Thompson and one Norton made the deed. Thompson is an extensive forger. Witness understood that the names of the witnesses were put to the deed in Chicago by Norton. Witness furnished the data which he had received from the defendant, and so the deed was made after he reached Chicago, in 1874. The deed was made to Hall, who is a "straw man," and at the same time a deed was made from Hall to Samuel Kail, who is a real man and lives at Altona, Illinois. Both deeds were mailed to Peck at Austin. Defendant had told witness at Austin that Peck was "all right," and would carry on the correspondence in the business. After the bogus deeds were received and recorded at Austin,

they were returned to Chicago. The witness recognized sundry letters and documents as the chirography of the defendant and Peck, and at a later stage of the trial they were admitted in evidence upon expert and circumstantial proof to the same effect. Most of the letters began "Friend John," which was the greeting intended for witness himself. After the bogus deeds were returned to Chicago from Austin, witness retained possession of the documents of which he was speaking until they were taken from him at Chicago by Hugh Chittick, a detective, and when witness next saw them they were in the hands of State's counsel in this case. The foregoing is a recapitulation of the most salient features of Strong's direct testimony, omitting much that is collateral or explanatory.

When this witness J. Barry Strong was first tendered by the State, the defense presented to the court a written suggestion that he was insane, and on that account objected to his competency as a witness, and insisted on the court hearing evidence on the suggestion, with a view to his exclusion. The court declined to take that course, but informed the defendant's counsel that they could elicit the facts in their cross-examination of the witness. The defense reserved exceptions to the action and ruling of the court on this matter, but in their cross-examination of the witness availed themselves of the court's suggestion, and succeeded in developing some curious idiosyncrasies.

The cross-examination first elicited some further particulars of the witness's former career as an actor, and also as a land-operator and litigator in Illinois and Missouri. In the latter State, he said he was admitted to the bar in 1867. Next he stated that he had a theory about all contagions and epidemics. "There are scoundrels who set them off by innoculation. Deval writes of them as early as 1665. They set off yellow fever, cholera,

small pox and various diseases, male and female kinds. The origin is *in hybrido*. Muzural offspring emanates all these. Every revival of religion in Africa or Asia among the blacks shoots off cholera or yellow fever, and murders twenty-five or thirty thousand people. Those who understand how it is done can set off these complaints at will. I understand the principle, and know just how it is done. I saved Memphis, New Orleans and Texas from yellow fever in 1880 and this year, and prevented the murder of fifteen millions of people. I understand this scoundrelism; I could set it off in seaboard cities and kill millions of people. Professor Grimmer was one of these innoculators. He foretold, and then intended to cause the verification by murdering fifteen millions of people in America; but I prevented it by my articles in Austin and Galveston papers. I know how it is done. I won't tell you how; that is my secret; I am going to print a book on it. The mixture of races is cause of all diseases, even black small pox, now set off in Kansas and Minnesota. But I won't tell you how; that's my business, and you have no right to it."

Dropping his theory for the time being, the witness stated that he was not present when the impression of the seal was put to the certificate of acknowledgment of the forged deed for the Gritten land. He furnished the paper for the deed, and got his brother to write the body of it for the express purpose, and then witness gave it to Norton and Thompson. The entire deed was made in Chicago, and no part of it in Texas. The three seals furnished by Maddox were obtained by witness for use in preparing a book which he proposed to publish on the subject of Land-Sharking. Those seals were not used in making the bogus deeds from Gritten to Hall and from Hall to Kail; they were never used by witness in making forgeries, nor did he ever agree to so use them. Those seals were not procured or kept by witness for any fraud-

ulent purpose. Witness had sometimes got blank deeds to fill up for the protection of honest people. Filling up or forging these deeds has been so extensive in Chicago that it has there got to be legitimate. Witness had filled up one or two for poor widows and such. Witness never went into the regular forging business. He came to Texas for the purpose of getting information about the burning of the court-house of Liberty county, and the further purpose of going in with Jones, who represented that he had much money, etc. In 1878, witness was brought by Chittick from Chicago to Texas under a requisition and charge of dealing in bogus land certificates, and was kept in jail at Austin eighteen months. He has an agreement with the State's attorney to tell all he knows and be released from all indictments against him. Witness is under no bond, and his expenses are not paid by the State, but he is no pauper nor thief, and can get all he needs and more now. He now owns the telephone for this State. "I had it fixed to me. . . My brother, H. C. Strong, is the patentee for the telephone. I am to be entirely released after testifying in this case, as I believe it is the last one. I have been writing here some on epidemics; am no doctor, but I am only cognizant of the facts of these epidemics, and have published a few articles on epidemics in my paper called 'Telephone,' a copy of which I see in court. They include 'Assassination of Fifteen Millions of People in America,' 'The Eastern World Depopulated,' 'Professor Grimmer Thwarted,' 'Yellow Fever Prevented By Me,' etc.; also a reference to the 22nd Chapter of Numbers to prove what is said in these articles, that is, to the conduct of Phineas." The witness enlarged on this topic, and concluded his testimony by reiterating that every part, letter, figure and character of the Gritten deed, including the witness clause and the certificate of acknowledgment, were made in Chicago, Illinois, and that nothing on or attached to that document

was of Texas production except the file-mark and certificate of the officer who recorded it. The paper and ink used in its fabrication were obtained in Chicago by the witness.

The State introduced proof that the two deeds of which Strong had testified were recorded by the proper officer of Travis county, in August and September, 1874, at the instance of Peck. Other evidence, mostly of a circumstantial or expert character, was introduced by the State for the purpose of corroborating the accomplice witness Strong. The seals, letters and papers identified by Strong were admitted. Repeated mention or reference to the Gritten "title," as well as to other such "land business," appears in the documents and letters.

The defense read in evidence the depositions of four Missouri lawyers, who testified that they knew John Barry Strong during his residence for many years in Missouri, and knew his general reputation there for truth and veracity. They concurred in pronouncing it bad, and stated that he was not to be believed on oath in matters affecting his interest. The defense also introduced testimony that the defendant, during the summer of 1874, resided at and near Luling in Caldwell county, and was very attentive to the sewing machine business in which he was there engaged.

The State recalled John Barry Strong, in rebuttal to the four Missourians who questioned his reputation, and he disposed of them summarily. " All four of those men who testified about my character are land-thieves. Their reputation is very bad, and they ought not to be believed on their oaths. Any man who will testify against my character is unworthy of belief. They are all lawyers and liars, and they are hostile to me, and are my enemies."

Being convicted as already stated, the defendant moved for a new trial and also in arrest of judgment. Both motions were overruled, and he appeals.

*B. Coopwood* and *Joe H. Stewart*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J.   Henry O. Rogers was convicted of forgery. The record informs us of the loss of the original indictment in this case, and that the county attorney filed a written statement, suggesting the loss and asking leave of the court to substitute said indictment, and that the court, upon being satisfied that a copy submitted by the county attorney was correct, ordered that said *leave* be granted, and the county attorney was allowed to substitute said original indictment by the copy then shown and submitted to the court, which was filed by the clerk. Upon this indictment the defendant was tried and convicted.   The defendant moved in arrest, and this motion was overruled and the defendant.excepted.

The question presented is, was the conviction under this substitution or copy legal ?   The counsel for defendant insists that it was not, because from the record it appears that all that was done in regard to this matter was to suggest the loss, ask and obtain leave of the court to substitute a certain copy which was submitted to and inspected by the court; but that in fact there was no judgment of the court declaring the fact of substitution.

The record must speak the fact affirmatively that the substitution as proposed by the county attorney was made.   It may be urged, however, that there appears from the record enough from which to presume that in fact the substitution was made.   If, in fact, the court did not order and adjudge the substitution there was no indictment in the case; hence we cannot indulge in presumptions; the record must speak that fact, not by way of inference, but directly and affirmatively.   *Turner* v. *State,* 7 Texas Ct. App. 596; *Crosswell* v. *Byrnes,* 9 Johns. 286; *Beardall* v. *State,* 9 Texas Ct. App. 266.

The State proved by H. B. DeBray as follows: "I am Spanish clerk and translator in the Land Office of Texas, and am custodian under the commissioner of the Spanish archives of that office. I have in my hands a book containing some of the original Spanish titles. In one of these appears the name of Edward Gritten in three places purporting to be his signature. These signatures appear to the application of Edward Gritten to become a colonist under the Mexican government; the second to his application for the grant of a league and labor of land as a colonist; and the third to his application for an augmentation of one-fourth of a league. (These three signatures are handed over to the jury and exhibited to them, to compare with the signature to the deed alleged to be forged.) I have an entry here in the book of entries of work. Entry: On 20th November, 1873, application was made to the Land Office by Weller and Rogers for translation of title to the Gritten league of land in Travis county and quarter of league in Bastrop county. The books show application for translated copies, and this book is one of the Land Office records. The rule of the office is, an application is made for the copy, and after it is made it is handed to the receiving clerk, who delivers it on payment of fees. The signatures referred to of Edward Gritten appeared to be written by the same person, were all well written, and had attached an extensive rubric or flourish of pen at end of each."

On cross-examination this witness DeBray testified as follows: "I only testify what is in the books. They are records of the office and show that application was made." On re-examination by the State, this witness testified: "The book is a memorandum of original entries. I think the handwriting is Mr. Goldbeck's."

Counsel for the defendant objected to this evidence: 1st, because the same is incompetent and irrelevant; 2d, because the person who made such entry has not been

brought into court, to testify thereto, and has not confronted this defendant according to law." Which objections were heard by the court and overruled, and the defendant excepted.

Was this evidence competent? A majority of this court hold that it is, upon this principle, or rule of law: The rule that the prisoner shall be confronted with the witnesses against him does not preclude such documentary evidence, to establish collateral facts, as would be admissible under the rules of the common law. *U. S.* v. *Bennie,* Baldwin, 240; *U. S.* v. *Little,* 2 Wash. C. C. 205; *U. S.* v. *Ortega,* 4 Wash. C. C. 531; Cooley's Const. Lim. 3d ed. p. 318, and note; also 1 Bish. Crim. Proc. secs. 1131, 1132, 1133.

The writer is not prepared to assent to the conclusion that this evidence is competent or admissible. Since the destruction of the library at this place, we have not been able to examine, as we should like, the subject under the light of authorities; we are not, therefore, prepared to give our reasons at this time. There is no division on the relevancy of the fact, if shown in the proper manner, that defendant procured the translation, etc. The point of difference is the manner of making the proof.

The forgery being made without the State, appellant's counsel argues with great force and ability that defendant, though he may have acted with those engaged, and have furnished the necessary information to consummate the forgery, and though every act of defendant was done in Travis county, cannot be tried and convicted of the forgery in this State, and that proof that the forgery took place in another State does not support the allegation that it occurred in Travis county.

The first question presented, to wit, that the defendant cannot be tried and convicted in this State, is treated at great length in *Ex parte H. O. Rogers,* 10 Texas Ct. App. 655.

The second point, that "proof of the forgery in another State fails to support the allegation that it was made in Travis county," we think is involved in the first; and if that has been properly decided against the appellant the second must be, especially when all of the acts of defendant were done in Travis county.

There are quite a number of assignments made by the appellant which to consider *seriatim* would require time that would not be profitable; the questions presented having been exhaustively discussed in the case of *Ex parte H. O. Rogers* v. *State,* and several other cases of the same school.

The record failing to show that the indictment was in fact substituted, the court should have sustained the motion in arrest. The judgment is reversed and the cause remanded.

*Reversed and remanded.*