# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 15, 2020        Decided January 19, 2021

No. 19-5362

AHMED ALI MUTHANA, INDIVIDUALLY, AND AS NEXT FRIEND
OF HODA MUTHANA AND MINOR JOHN DOE,
APPELLANT

v.

MICHAEL R. POMPEO, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE DEPARTMENT OF STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00445)

*Christina A. Jump* argued the cause for appellant. With her
on the briefs was *Charles D. Swift*.

*Scott G. Stewart*, Deputy Assistant Attorney General, U.S.
Department of Justice, argued the cause for appellees. With
him on the brief were *Joseph H. Hunt*, Assistant Attorney
General, *William C. Peachey*, Director, Office of Immigration
Litigation, *Anthony D. Bianco*, Senior Litigation Counsel,
*Christopher A. Bates*, Senior Counsel, and *Joseph F. Carilli
Jr.*, Trial Attorney.

*John C. Eastman* and *Anthony T. Caso* were on the brief for *amicus curiae* Center for Constitutional Jurisprudence in support of appellees.

Before: TATEL and RAO, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Opinion concurring in the judgment filed by *Circuit Judge* TATEL.

RAO, *Circuit Judge*: Hoda Muthana grew up in the United States, but at age twenty left college to join the Islamic State of Iraq and Syria ("ISIS"). After marriage to two different ISIS fighters, Hoda now seeks to return to the United States with her son, John Doe. The State Department maintains that Hoda is not a citizen and has no right to return to the United States. Hoda's father, Ahmed Ali Muthana ("Muthana"), initiated this lawsuit on behalf of his daughter and grandson to settle their citizenship. The district court held that Hoda and her son are not U.S. citizens, because Hoda's father possessed diplomatic immunity when she was born in the United States, rendering her ineligible for citizenship by birth under the Fourteenth Amendment and her son ineligible for citizenship under 8 U.S.C. § 1401(g). We affirm the district court. A child born in the United States to a foreign diplomat is not born "subject to the jurisdiction" of the United States and thus not entitled to citizenship by birth under the Fourteenth Amendment. Hoda Muthana is not now and never was a citizen of the United States because her father enjoyed diplomatic immunity pursuant to the Vienna Convention on Diplomatic Relations when she was born, and she was never naturalized. Because Hoda is not a citizen, neither is her son, who was born abroad to two alien parents.

Muthana also sought mandamus relief to compel the United States to assist in bringing Hoda and John Doe back to the United States; however, we have no jurisdiction over such a claim and it must be dismissed. Finally, Muthana sought a declaratory judgment that if he sent money and supplies to his daughter and grandson, he would not violate the prohibition on providing material support for terrorism, 18 U.S.C. § 2339B. We agree with the district court that Muthana did not establish standing because he failed to allege a personal injury to his constitutional rights.

I.

Ahmed Ali Muthana served as the First Secretary of the Permanent Mission of Yemen to the United Nations. During this posting he lived in New Jersey with his wife and children. The United Nations notified the State Department of Muthana's appointment in October 1990, thus entitling him to diplomatic-level immunity pursuant to the U.N. Headquarters Agreement and the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (the "Vienna Convention").[1] After several years, Yemen terminated Muthana from his diplomatic post and required him to surrender his diplomatic credentials no later than September 1, 1994. In October 1994,[2] Hoda Muthana was

---

[1] The United States accords diplomats stationed at U.N. missions the same privileges and immunities as diplomats stationed at embassies and consulates. *See* Agreement Between the U.S. and U.N. Respecting the Headquarters of the U.N., June 26, 1947, 61 Stat. 3416; Convention on Privileges and Immunities of the U.N., Feb. 13, 1946, 21 U.S.T. 1418. The State Department certified that Muthana possessed "diplomatic agent level immunity." J.A. 18.

[2] As the precise date of Hoda's birth is immaterial to the legal questions, we omit it here in order to protect her privacy.

born in New Jersey to Muthana and his wife, neither of whom was an American citizen at the time. On February 6, 1995, the United Nations notified the State Department that Yemen had terminated Muthana from his diplomatic post. Muthana and his wife, as well as Hoda's older siblings, eventually became naturalized citizens. Hoda, however, was never naturalized as a U.S. citizen. Muthana applied for a U.S. passport on behalf of Hoda, which the State Department issued in 2005 and then renewed in 2014.

Later in 2014, Hoda dropped out of college, traveled to Syria, and joined ISIS. Hoda became a prominent spokeswoman for ISIS on social media, advocating the killing of Americans and encouraging American women to join ISIS. She also married two ISIS fighters in succession and had a child, John Doe, by way of her second husband, who was an ISIS fighter from Tunisia. In 2016, the State Department revoked Hoda's passport after determining that it had been issued in error because Hoda was not a U.S. citizen by birth and had never been naturalized. In a letter sent to Hoda's last known address, the State Department informed her of the passport revocation and explained that the passport had been issued based on an error of fact—the government's mistaken belief that at the time of Hoda's birth, Muthana no longer possessed diplomatic immunity. In fact, Muthana retained his diplomatic immunity until at least February 6, 1995, months after Hoda's birth. As the State Department explained, a child born to a diplomat is not "subject to the jurisdiction" of the United States, and therefore does not have citizenship by birth. U.S. CONST. amend. XIV, § 1. Muthana received the letter and sent a response asserting his daughter is a U.S. citizen by birth. In 2018, as the ostensible Caliphate crumbled, Hoda and her son fled and allegedly remain in a camp in Syria run by Kurdish forces.

After receiving communications from his daughter, Muthana contacted the U.S. Attorney for the Northern District of Alabama, where he resided, and expressed Hoda's "desire to return as well as her willingness to surrender to United States authorities for any contemplated charges." The U.S. Attorney responded by referring the matter to the State Department. About a month later, Secretary of State Mike Pompeo issued a public "Statement on Hoda Muthana" declaring that "Ms. Hoda Muthana is not a U.S. citizen and will not be admitted into the United States. She does not have any legal basis, no valid U.S. passport, no right to a passport, nor any visa to travel to the United States." This statement was recognized by President Donald Trump, who tweeted: "I have instructed Secretary of State Mike Pompeo, and he fully agrees, not to allow Hoda Muthana back into the Country!"

The next day, Muthana filed a nine count complaint in the U.S. District Court for the District of Columbia, alleging these statements effectively revoked his daughter's and grandson's U.S. citizenship in violation of the Fourteenth Amendment. First, proceeding as next friend to his daughter and grandson, Muthana sought a declaratory judgment "recognizing the citizenship of his daughter and grandson." Second, again proceeding as next friend, Muthana sought "injunctive and mandamus relief obligating the United States to accept Ms. Muthana and her son back into the United States and to use all available means to do so." Third, Muthana sought a declaratory judgment that he would not violate the prohibition on providing material support for terrorism, 18 U.S.C. § 2339B, if he sent money and supplies to his daughter and grandson in Syria. The government moved to dismiss for lack of subject matter jurisdiction and failure to state a claim, or, in the alternative, for summary judgment. In support of its motion, the government attached a certification from the State Department that Muthana and his family possessed diplomatic

immunity until February 6, 1995, well after Hoda's birth in October 1994.

The district court granted summary judgment to the government on the citizenship and reentry claims and dismissed the material support claim for lack of subject matter jurisdiction. The court first found Muthana could proceed as "next friend" to his daughter and grandson because he had a "significant relationship" to them and they were unavailable due to their presence in Syria. Turning to the merits, the district court converted the government's Federal Rule of Civil Procedure 12(b)(6) motion for failure to state a claim into a Rule 56 motion for summary judgment. The court held that Muthana's citizenship and reentry claims all failed for the same fundamental reason: Hoda is not, and never has been, a U.S. citizen. The court determined that the State Department reasonably interpreted the Vienna Convention to provide for diplomatic immunity until the sending state notifies the receiving state of the diplomat's termination. The court next found that the State Department's certification was conclusive proof that Muthana continued to enjoy diplomatic immunity on the date his daughter was born. Because the child of a diplomat is not born "subject to the jurisdiction" of the United States, the court held that Hoda was not entitled to citizenship by birth and, since she was not subsequently naturalized, never became a U.S. citizen. Finally, the court dismissed for lack of jurisdiction Muthana's request for a declaration that he would not violate the statutory prohibition on providing material support for terrorism by sending aid to his daughter and grandson. The court determined that Muthana failed to allege the statute violated his constitutional rights. Muthana timely appealed.

II.

Although the government does not renew its challenge to standing on appeal, we have an independent obligation to ensure our jurisdiction. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012). There is a serious question of whether Muthana can sustain next friend standing on behalf of his adult daughter Hoda. Next friend standing is a narrow exception to Article III standing, which requires that a party assert his own rights in alleging an injury in fact. Next friend standing has been generally limited to three historically grounded exceptions codified by Congress: a person may assert next friend standing on behalf of minors and incompetents, or to seek a writ of habeas corpus. *See Whitmore v. Arkansas*, 495 U.S. 149, 163 n.4 & 164 (1990) ("Indeed, if there were no restriction on 'next friend' standing in federal courts, the litigant asserting only a generalized interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply by assuming the mantle of 'next friend.'"). Hoda does not fit within any of the established exceptions. At age twenty, she is not a minor, and Muthana has not asserted that she is incompetent. *See* FED. R. CIV. P. 17(c). Nor does Muthana petition for a writ of habeas corpus on Hoda's behalf.

We need not decide whether Muthana may proceed as next friend to Hoda, however, because Muthana may proceed as next friend to his grandson.[3] Federal Rule of Civil

---

[3] The district court held there was next friend standing for Hoda and John Doe by relying on *Ali Jaber v. United States*, which held that next friend standing may be invoked whenever a "plaintiff[] can sufficiently demonstrate its necessity," and therefore that next friend standing does not require statutory authorization. 155 F. Supp. 3d 70, 76 (D.D.C. 2016). We are not aware of any Supreme Court or circuit precedent that extends next friend standing beyond the exceptions

Procedure 17 allows a next friend to sue on behalf of a minor. Next friend standing on behalf of minors is a long-recognized exception to the rule that a litigant can claim injury only to his personal interests. *See Whitmore*, 495 U.S. at 163 n.4. This exception recognizes that a minor "must be represented by a competent adult" to pursue his claims in court. *T.W. by Enk v. Brophy*, 124 F.3d 893, 895 (7th Cir. 1997); *see also Whitmore*, 495 U.S. at 165 (explaining the "ancient tradition" of next friend standing requires that "the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability"). Muthana thus may proceed on behalf of his grandson if he qualifies as his next friend. He does.

To determine whether a person may proceed as next friend to a minor, we examine the relationship between the proposed next friend and minor. *See T.W. by Enk*, 124 F.3d at 897; *cf. Whitmore*, 495 U.S. at 163–64 (explaining that, to obtain a writ of habeas corpus as a next friend, the next friend "must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate" and suggesting that a significant relationship is required). Not every person who is interested in serving as a minor's next friend qualifies for that role. There must ordinarily be a significant relationship between the proposed next friend and minor, *see T.W. by Enk*, 124 F.3d at 897, though

codified by Congress. *Ali Jaber* misconstrues the Supreme Court's decision in *Whitmore*, which identified serious Article III concerns with expanding next friend standing and simply reserved the question of whether next friend standing could be sustained absent statutory authorization. *Whitmore*, 495 U.S. at 164. Moreover, we note that a decision of our district court "do[es] not establish the law of the circuit, nor, indeed, do[es it] even establish the law of the district." *In re Executive Office of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) (cleaned up).

that requirement may not rigidly apply when a minor has no significant relationships, *see Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 91 (1st Cir. 2010).

Muthana easily qualifies as next friend to his grandson. A minor's parent or close relative is a natural fit to serve as his next friend in most cases. The government argued below that, as his mother, Hoda was the appropriate next friend for John Doe. But when a minor's parent is "unable, unwilling or refuses to act" as next friend to the minor, another person may proceed as next friend. *See Ad Hoc Comm. of Concerned Teachers v. Greenburgh No. 11 Union Free Sch. Dist.*, 873 F.2d 25, 30 (2d Cir. 1989). Hoda is unable to proceed as John Doe's next friend because she is inaccessible in a Kurdish camp in Syria and unable to return to the United States. Muthana is a close relative of John Doe who is able and willing to litigate his claims. Because Muthana has a significant relationship to his grandson, he may proceed as John Doe's next friend.

Once a court determines that a party has standing to proceed as next friend, it must determine if the real party in interest possesses standing in his own right. Here, the alleged deprivation of American citizenship without due process of law is a judicially cognizable injury in fact. *See* U.S. CONST. amend. XIV, § 1; *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963) ("Citizenship … is expressly guaranteed by the Fourteenth Amendment to the Constitution, which speaks in the most positive terms."). Accepting Muthana's allegations as true, the U.S. government denied John Doe his U.S. citizenship without due process. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that we take a plaintiff's affidavits and other factual evidence as true when determining standing at the summary judgment stage). This injury is actual and personal to John Doe, fairly traceable to the

government's conduct, and redressable through a declaratory judgment settling his citizenship. *See id.* at 560–61. Because John Doe would have standing to bring his citizenship claim, Muthana can pursue this claim as his grandson's next friend.

The district court had jurisdiction to determine John Doe's citizenship, a question that necessarily required a determination of his mother's citizenship. Under the Immigration and Nationality Act, a person born outside the United States to one citizen-parent is a citizen as long as his citizen-parent lived in the United States for five years, and was at least fourteen years old for two of those years. 8 U.S.C. § 1401(g).[4] The only alleged basis for John Doe's citizenship is the citizenship of his mother. Therefore, it is impossible to disaggregate the question of John Doe's citizenship from that of his mother's. Although Muthana cannot proceed as next friend to Hoda, the district court was required to determine Hoda's citizenship as a necessary incident of its jurisdiction to determine John Doe's citizenship.

We review de novo a district court's grant of summary judgment and dismissal of a claim for lack of subject matter jurisdiction. *Waggel v. George Washington Univ.*, 957 F.3d

---

[4] As relevant here, 8 U.S.C. § 1401 provides:

> The following shall be nationals and citizens of the United States at birth: … (g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years[.]

1364, 1371 (D.C. Cir. 2020) (summary judgment); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156 (D.C. Cir. 2005) (lack of jurisdiction). Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

III.

Although Muthana's claims focus on the revocation of citizenship for Hoda and John Doe, this case requires us to first ascertain whether Hoda and John Doe were United States citizens. That question turns on whether Muthana possessed diplomatic immunity when Hoda was born. Under the Fourteenth Amendment, "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. CONST. amend. XIV, § 1. A child born on U.S. soil to a foreign diplomat possessing diplomatic immunity is not eligible for citizenship by birth because she is not born "subject to the jurisdiction" of the United States. *See United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); *Nikoi v. Att'y Gen.*, 939 F.2d 1065, 1066 (D.C. Cir. 1991) ("The jurisdiction clause was intended to exclude from its operation children of ministers of foreign States born within the United States.") (cleaned up). We agree with the district court that because Muthana enjoyed diplomatic immunity at the time of Hoda's birth, she did not become a citizen at birth and therefore John Doe did not acquire citizenship because he was born abroad to non-citizen parents.

The argument proceeds as follows. First, under the Vienna Convention, diplomatic immunity continues until notification of a diplomat's termination to the host country. Muthana's arguments to the contrary cannot be squared with the plain

meaning of the Convention and longstanding diplomatic practice. Second, in this case the State Department certified to the district court that it was notified of Muthana's termination on February 6, 1995. Under our precedents, such certification provides conclusive evidence that Muthana enjoyed diplomatic immunity at the time of Hoda's birth in October 1994, and therefore that Hoda did not become a U.S. citizen at birth. Finally, we cannot grant Muthana equitable relief because courts have no power to confer citizenship where it otherwise does not exist under the laws of the United States.

## A.

Diplomatic immunity is governed by the Vienna Convention on Diplomatic Relations. *See* 23 U.S.T. 3227. When interpreting treaties, "we are guided by principles similar to those governing statutory interpretation." *Iceland S.S. Co., Ltd.-Eimskip v. Dep't of Army*, 201 F.3d 451, 458 (D.C. Cir. 2000). Muthana argues that the Convention allows diplomatic immunity to cease on the date of his *termination* from his diplomatic post, which was prior to Hoda's birth. Because he lost diplomatic immunity before his daughter's birth, Muthana maintains that Hoda is a birthright citizen. The government argues that the Convention requires diplomatic immunity to continue until a reasonable period after *notification of termination* to the host country. Because the State Department was not notified of Muthana's termination until after Hoda's birth, she is not a citizen by virtue of her birth in the United States. "[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Starr Int'l Co. v. United States*, 910 F.3d 527, 537 (D.C. Cir. 2018) (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)).

Here, the State Department's interpretation comports with the plain meaning of the Convention that diplomatic immunity ceases when the host country is notified of the termination. Article 43 of the Convention states in full:

> The function of a diplomatic agent comes to an end, inter alia: (a) on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end; (b) on notification by the receiving State to the sending State that, in accordance with paragraph 2 of Article 9, it refuses to recognize the diplomatic agent as a member of the mission.

23 U.S.T. 3227, art. 43. Article 39 of the Convention connects the end of diplomatic functions with diplomatic immunity, providing that "[w]hen the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease" when the diplomat leaves the country or after a "reasonable period in which to do so, but shall subsist until that time." *Id.* at art. 39. The text of the Convention plainly provides that a diplomat's functions end upon "notification" to the receiving state and that diplomatic immunities continue from the date of notification for a "reasonable period" or until the diplomat leaves the country.

This notification condition comports with longstanding principles of international law and state practice, which allowed diplomatic immunity to continue for a reasonable period after diplomatic service ended and thereby protected diplomats by giving them some breathing room to leave the country or to make other arrangements without exposure to the jurisdiction of the host country. *See, e.g.*, Emer de Vattel, THE

14

LAW OF NATIONS bk. IV, ch. IX § 125 (B. Kapossy & R. Whatmore eds., 2008) ("[W]hen he is obliged to depart on any account whatever, his functions cease: but his privileges and rights do not immediately expire. … His safety, his independence, and his inviolability, are not less necessary to the success of the embassy in his return, than at his coming."). The notification standard ensures that decisions regarding the status of diplomats generally turns on the determinations of the sending state.[5] Luke T. Lee, CONSULAR LAW AND PRACTICE 95 (2d ed. 1991) (explaining that the notification standard respects state sovereignty by preventing "the receiving State [from] investigating the internal administration of the foreign consular organization in order to determine what status the [diplomatic or consular officer] holds"); cf. Vattel, THE LAW OF NATIONS bk. IV, ch. IX § 78 (noting a sovereign's exclusive control over its diplomatic missions abroad). Thus, under the plain meaning of the Convention, reinforced by historical practice, diplomatic immunity continues at least until the host country is notified of a diplomat's termination.[6]

---

[5] A receiving state can end the functions of a diplomat by following the requirements of Article 43(b), which requires notice to the sending state and then the provision of a "reasonable period" of continued immunity under Article 39.

[6] The parallel evolution of consular immunity also bolsters the interpretation of termination and notification as distinct standards for governing the cessation of diplomatic functions. Before 1963, an individual possessing consular immunity, as opposed to full diplomatic immunity, generally lost such immunity immediately upon termination, rather than notification. The Vienna Convention on Consular Relations, however, ended "[t]he differential treatment accorded to consuls," Lee, CONSULAR LAW AND PRACTICE 112, and replaced the termination standard with the notification standard, Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, art. 25(a). This history buttresses the conclusion that

15

To support his interpretation, Muthana asserts that the term "inter alia" in Article 43 demonstrates that diplomatic immunity can cease either on the date the receiving state is notified of termination or the date of actual termination. Muthana argues that "inter alia" is a term of illustration, not of exclusion, so although notification is an example of when diplomatic immunity may cease, it is not the only standard. According to Muthana, Article 43 does not foreclose an interpretation that diplomatic immunity ends as of the date of termination.[7] He reasons that, because termination is a possible standard, the State Department's decisions in 2005 and 2014 to issue a passport to Hoda were exercises of the Department's "discretion" to determine that Muthana did not have diplomatic immunity at the time of Hoda's birth.

Muthana's arguments, however, cannot be squared with the text, structure, purpose, and history of the Convention. As

---

notification and termination are distinct periods for marking the end of diplomatic immunity.

[7] Muthana's reliance on *Raya v. Clinton*, 703 F. Supp. 2d 569, 578 (W.D. Va. 2010), is misplaced because that case concerned a termination that occurred *after* notification. In *Raya*, Egypt notified the United States in advance that a diplomat's functions would terminate in a few days. This notification meant that the diplomat's immunity would continue until he left the country or the expiry of a reasonable period in which to do so. *Id.*; *see also* 23 U.S.T. 3227, arts. 39 & 43. Because notification occurred before termination, the termination date informed how long the diplomat's immunity would subsist for the "reasonable period" for him to leave the country. *See Raya*, 703 F. Supp. 2d at 578. Here Muthana was terminated before the United States was notified of his termination and the relevant legal question in this case is about the date of notification of termination, not about the length of a "reasonable period" for continued immunity after notification.

already discussed, the plain meaning of the Convention provides for a diplomat's functions to continue until notification of termination to the receiving state. The Convention's use of "inter alia" in Article 43 refers to other established circumstances that might end diplomatic functions, such as the death of a diplomat, the extinction of the sending or receiving state, a regime change, severance of diplomatic relations, and war. *See, e.g.*, 23 U.S.T. 3227, art. 39(3) (death of a diplomat), art. 45 (war and severance of diplomatic relations). Thus, "'*inter alia*', as used in the Vienna Convention indicate[s] also the existence of other conditions. All of these are now described." Lee, CONSULAR LAW AND PRACTICE 94. What "inter alia" does not include is allowing diplomatic immunity to turn on termination, a condition nowhere specified in the Convention and inconsistent with longstanding diplomatic practice.

Muthana's reading of coexisting termination and notification standards also runs afoul of one of the purposes of the Convention, namely to provide certainty and clarity in diplomatic relations. If either termination or notification of termination could govern the end of a diplomat's functions, diplomats could not be certain of the continuation of their immunity and host countries would not be certain of the status of lingering diplomats. *See id.* at 93 (explaining that international crises have arisen due to disagreement and confusion over when diplomatic immunity terminates). The Convention seeks to establish uniform standards for the diplomatic intercourse between nations in order to promote predictability and reciprocity. *See id.* (highlighting the importance of a "[c]lear statement of the condition under which the consular status of an individual terminates") (citation and quotation marks omitted); *see also* 23 U.S.T. 3227 pmbl. (explaining the Vienna Convention was created to ensure there is "an international convention on diplomatic intercourse" to

"contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems"). As the government stresses here, the Convention "serves to protect United States diplomats abroad, which is a critical national interest of the United States." Gov't Br. 6. An interpretation that renders the standard governing the end of diplomatic immunity uncertain would provide less protection to diplomats and the nations they represent and could undermine reciprocal treatment of American diplomats abroad.

Finally, although the State Department has some discretion over questions of diplomatic immunity even within the terms of the Convention,[8] the government does not suggest that such discretion was exercised here to deny Muthana diplomatic immunity before notification of his termination and thereby to recognize Hoda's citizenship by birth. To the contrary, the government maintains that at the time of Hoda's birth, Muthana continued to enjoy diplomatic privileges and immunities. In addition to its certification, the government presented several contemporaneous records corroborating that Muthana had diplomatic status after Hoda's birth. For example, it presented a file from the U.N. Office of Protocol reflecting that Muthana's diplomatic status continued until February 6, 1995. S.A. 109. The government maintains that the issuance of a passport to Hoda in 2005 and 2014 was in error. It would seem far afield of the judicial role to convert a government error into an exercise of executive discretion in the sensitive

---

[8] For example, the Diplomatic Relations Act vests the President with the authority to "specify [diplomatic privileges] … which result in more favorable treatment or less favorable treatment than is provided under the Vienna Convention," and he may do so "on the basis of reciprocity and under such terms and conditions as he may determine." 22 U.S.C. § 254c(a).

arena of diplomatic relations.

Consistent with historical practice, the Vienna Convention explicitly recognizes that diplomatic functions continue until notification of termination to the host country and that immunity is maintained for some "reasonable period" after such notification. We therefore hold that Muthana's diplomatic immunity continued at least until the United States was notified of his termination by Yemen.

### B.

Whether Hoda and John Doe are citizens depends on whether Muthana enjoyed diplomatic immunity at the time of Hoda's birth. Under the Vienna Convention, the question turns on one dispositive fact: when was the United States notified that Muthana was no longer a diplomat? The State Department certified to the district court that the United States received notice of Muthana's termination on February 6, 1995. The district court accepted this certification as conclusive proof that Muthana had diplomatic immunity when his daughter was born in October 1994. Muthana attempts to rebut this conclusion by relying on a document obtained when applying for Hoda's passport. That letter states Muthana was "notified to the United States Mission" as a diplomat from October 15, 1990, to September 1, 1994. In light of more than a century of binding precedent that places the State Department's formal certification of diplomatic status beyond judicial scrutiny, we conclude the certification is conclusive and dispositive evidence as to the timing of Muthana's diplomatic immunity. With no dispute of material fact, summary judgment for the government was appropriate.

The Constitution vests the President with the sole power to "receive Ambassadors and other public Ministers."

U.S. CONST. art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."), § 3 ("[H]e shall receive Ambassadors and other public Ministers."). The Reception Clause recognizes the President's authority to determine the status of diplomats, a fact long confirmed by all three branches. *See, e.g.*, Crimes Act of 1790 ch. IX § 25, 1 Stat. 112, 117–18; Presidential Power to Expel Diplomatic Personnel from the United States, 4A Op. O.L.C. 207, 208–09 (Apr. 4, 1980); *In re Baiz*, 135 U.S. 403, 432 (1890). Just as the President is vested with the "exclusive" power to recognize foreign governments, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015), his "action in … receiving … diplomatic representatives is conclusive on all domestic courts," *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938).

Recognizing the vesting of these diplomatic powers with the President, courts have afforded conclusive weight to the Executive's determination of an individual's diplomatic status. *See In re Baiz*, 135 U.S. at 432 (Courts may not "sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister."). Justice Bushrod Washington, riding circuit, explained why the Constitution compels this rule:

> The constitution of the United States having vested in the president the power to receive ambassadors and other public ministers, has necessarily bestowed upon that branch of the government, not only the right, but the exclusive right, to judge of the credentials of the ministers so received; and so long as they continue to be recognized and treated by the president as ministers, the other branches of the government are bound to consider them as such.

*United States v. Ortega*, 27 F. Cas. 359, 361 (C.C.E.D. Pa. 1825) (Washington, J.). This understanding has survived to the present day. *See Carrera v. Carrera*, 174 F.2d 496, 497–98 (D.C. Cir. 1949); *Zdravkovich v. Consul Gen. of Yugoslavia*, 1998 WL 389086, at \*1 (D.C. Cir. June 23, 1998) ("The courts are required to accept the State Department's determination that a foreign official possesses diplomatic immunity from suit.").[9]

In litigation implicating the status of diplomats, the courts and the Executive have developed a practice in which the Executive submits a certification of a diplomat's status to the court. For example, in *Carrera*, we explained that the Executive's certification of immunity is entitled to conclusive weight when it is "transmitted to the district judge" by the State Department: "It is enough that an ambassador has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the Department's recognition has been communicated to the court." 174 F.2d at 497. We noted that this was the process that was "approved by the Supreme Court in *In re Baiz*." *Id.*; *see also United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004); *Abdulaziz v. Met. Dade County*, 741 F.2d 1328, 1330–31 (11th Cir. 1984); 4A Op. O.L.C. at 208–09. In this case, the State Department has submitted under this longstanding process a formal certification that the United States was notified of Muthana's termination from his diplomatic position

---

[9] This view is also uniformly maintained by our sister circuits. *See, e.g.*, *United States v. Al-Hamdi*, 356 F.3d 564, 568, 573 (4th Cir. 2004); *Abdulaziz v. Met. Dade County*, 741 F.2d 1328, 1331 (11th Cir. 1984); *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) ("[R]ecognition by the executive branch—not to be second-guessed by the judiciary—is essential to establishing diplomatic status.").

on February 6, 1995.

In response, Muthana argues that the certification is not conclusive as to the dates of immunity because the district court was required to weigh the additional evidence he submitted, which he claims at least creates a dispute of material fact sufficient to prevent summary judgment. Specifically, Muthana attached a 2004 letter from Russell Graham (the "Graham Letter"), in which the United States Mission to the United Nations informed the Bureau of Citizenship and Immigration Services that Muthana was "notified to the United States Mission" as a diplomat from October 15, 1990, to September 1, 1994. Muthana argues that the district court should have given more weight to the Graham Letter than the State Department's certification, which was produced twenty years after Hoda's birth and after this lawsuit was filed. Because the Graham Letter was dated from before Hoda received her passport, Muthana suggests the Letter demonstrates that the State Department understood he was not in a diplomatic role when Hoda was born.

Even on its own terms, however, the Graham Letter creates no dispute over the relevant legal fact of when the United States was *notified* of Muthana's termination. The Graham Letter notes only two dates: Muthana's date of appointment as a diplomat, October 15, 1990, and his date of termination, September 1, 1994. The Graham Letter merely addresses the duration of Muthana's diplomatic position and when it was terminated. The Graham Letter says nothing about when the United States was notified of Muthana's termination and therefore when his diplomatic immunity ended.

In any event, we must accept the State Department's formal certification to the Judiciary as conclusive proof of the dates of diplomatic immunity. *See, e.g.*, *Carrera*, 174 F.2d at

497. The Executive's determination cannot be attacked by "argumentative or collateral proof." *See In re Baiz*, 135 U.S. at 432. When a diplomat has been recognized by the Executive, "the evidence of those facts is not only sufficient, but in our opinion, conclusive upon the subject of his privileges as a minister." *Ortega*, 27 F. Cas. at 362. *See also Carrera*, 174 F.2d at 498 ("[T]he Secretary having certified Carrera's name as included in the list, judicial inquiry into the propriety of its listing was not appropriate."); *Al-Hamdi*, 356 F.3d at 573 (explaining that the State Department's certification "is conclusive evidence as to [] diplomatic status"). The State Department made a formal certification in this case, and it cannot be undermined by collateral evidence such as the Graham Letter, a document of unknown provenance that Muthana attached to his complaint.

By accepting the certification as conclusive, we decline to second-guess the Executive's recognition of diplomatic status. If courts could rely upon extrinsic evidence submitted by private parties to impeach the credibility of the Executive's formal certification, the certification would not be conclusive, and the courts rather than the Executive would have the final say with respect to recognizing a diplomat's immunity.[10] *See United States v. Pink*, 315 U.S. 203, 230 (1942) ("We

---

[10] Contrary to the concurring opinion, the State Department argued that its certification was "conclusive" and "dispositive." Gov't Br. 30–31. When discussing the effect of the Graham Letter at oral argument, the State Department argued that, "under *Baiz*," its certification "ha[s] a special status here." Oral Arg. Tr. 25:3–4; *see also* Oral Arg. Tr. 17:1–3. Indeed, the Department advanced in its brief the argument the court adopts today: "Under established law that has been consistent for over a century, when the Department of State certifies the diplomatic status of an individual, the courts are bound to accept that determination." Gov't Br. 25 (citation and quotation marks omitted).

would usurp the executive function if we held that that [the recognition] decision was not final and conclusive in the courts."). The district court properly held that the State Department's certification is conclusive proof of the dates of Muthana's immunity and declined Muthana's request to look behind the certification or to order discovery.

Under the Vienna Convention, immunity continues at least until notification of termination, and the State Department here certified to the district court that notification of Muthana's termination occurred on February 6, 1995. Thus, Muthana possessed diplomatic immunity when his daughter was born in October 1994. As a consequence, Hoda Muthana was not born "subject to the jurisdiction" of the United States and is not a citizen by birth under the Fourteenth Amendment. *See Nikoi*, 939 F.2d at 1066. This also means that John Doe did not acquire citizenship based on parentage under 8 U.S.C. § 1401(g), since neither of his parents was a U.S. citizen when he was born.

## C.

Muthana also seeks equitable relief. He maintains that the government should be equitably estopped from "stripping" Hoda of her U.S. citizenship. He contends the State Department previously determined that Muthana's diplomatic post terminated prior to Hoda's birth when it issued her a passport in 2005, recognizing her right to citizenship by birth.[11]

---

[11] Muthana sensibly does not rest his argument solely on the State Department's issuance and subsequent revocation of Hoda's passport. As Muthana acknowledges, a passport "does not confer citizenship upon its recipient." *Hizam v. Kerry*, 747 F.3d 102, 109 (2d Cir. 2014). The Secretary of State is authorized to "cancel any United States passport … if it appears that such document was … erroneously obtained from … the Secretary," 8 U.S.C.

Muthana also highlights the unfairness created by the State Department's issuance and subsequent revocation of Hoda's passport. He explains that, had he known Hoda was not born a U.S. citizen, he would have pursued the naturalization process for her, as he did for himself, his wife, and their other children.

Although Muthana may have had a good faith understanding that his daughter acquired citizenship at birth, an error initially shared by the State Department, the law affords Muthana no relief. As we have explained, Hoda has never been a U.S. citizen and therefore the State Department revoked her passport, but could not strip her of a citizenship she never lawfully enjoyed. Even if the State Department previously recognized Hoda as a citizen as Muthana contends, the Executive can only recognize lawful citizenship, and Hoda did not acquire citizenship at birth because her parents had diplomatic immunity. We cannot now order the State Department to recognize Hoda's citizenship, because she is not a citizen under the Constitution or laws of the United States. The Executive has no authority to confer citizenship on Hoda outside of the naturalization rules created by Congress.[12]

---

§ 1504(a), and the State Department cancelled Hoda's passport in 2016. Thus, the State Department's issuance, renewal, and revocation of Hoda's passport cannot settle her claim to citizenship.

[12] The Constitution vests the exclusive power "[t]o establish an uniform Rule of Naturalization" in Congress. U.S. CONST. art. I, § 8; *Chirac v. Chirac's Lessee*, 15 U.S. 259, 269 (1817) (Marshall, C.J.) ("[T]he power of naturalization is exclusively in congress."). The Executive cannot unilaterally confer citizenship. Congress may, however, grant citizenship through private bills, which are generally reserved for "cases that are of such an extraordinary nature that an exception to the law is needed." H.R. COMM. ON THE JUDICIARY, SUBCOMM. ON IMMIGR. & CITIZENSHIP, 116TH CONG., RULES OF

Nor do the courts have an equitable power to grant citizenship. "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *INS v. Pangilinan*, 486 U.S. 875, 885 (1988); *Fedorenko v. United States*, 449 U.S. 490, 506 (1981) ("Congress alone has the constitutional authority to prescribe rules for naturalization.") (citing U.S. CONST. art. I, § 8). Having held that Hoda is not a citizen under the Fourteenth Amendment and her son is not a citizen under 8 U.S.C. § 1401(g), we cannot confer citizenship through equity.

\* \* \*

For the foregoing reasons, we affirm the district court's conclusion that Hoda Muthana and her son are not, and never have been, citizens of the United States.

IV.

Having held that Hoda and her son are not citizens, the district court properly denied Muthana's mandamus petition. Rather than grant the government summary judgment on this count, however, the district court should have dismissed Muthana's mandamus claims for lack of subject matter jurisdiction. Under 28 U.S.C. § 1361, "[a] court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010) (cleaned up). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of

---

PROC. & STATEMENT OF POL'Y FOR PRIV. IMMIGR. BILLS, at 3 (2019).

jurisdiction." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Thus, "mandamus jurisdiction under § 1361 merges with the merits." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (citation and quotation marks omitted).

Muthana sought a writ of mandamus obligating the United States to use all available means to return his daughter and grandson to the United States. To do so, he asked the court to "order the government to affect her return to the United States, including but not limited to the use of military or other government aircraft." Pl.'s Mem. in Support 21, *Muthana v. Pompeo*, No. 1:19-cv-00445-RBW (D.D.C. Mar. 1, 2019), ECF No. 15. Not even citizens have a clear right to assistance from the U.S. government in coming to U.S. territory, so aliens certainly have none. Accordingly, Hoda and her son lack any right to this relief. We therefore remand this claim and direct the district court to dismiss Muthana's mandamus petition for lack of subject matter jurisdiction.

V.

Finally, the district court correctly dismissed for lack of standing Muthana's claim for a declaratory judgment that he would not violate the prohibition on providing material support for terrorism if he sent money and supplies to his daughter and grandson. *See* 18 U.S.C. § 2339B. In pursuing this claim, Muthana proceeded in his personal capacity rather than as next friend to his daughter and grandson. The district court held that he lacked standing because he failed to identify a personal constitutional right that would be affected by the enforcement of the statutory prohibition on providing material support for terrorism. We agree.

To establish standing for a preenforcement challenge, a plaintiff must demonstrate first "an intention to engage in a

course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and, second, that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation and quotation marks omitted). Muthana's claim fails under the first requirement because he did not allege that the material support statute was unconstitutional as applied to his intended conduct. Instead, he argued that he would not violate the statute by sending support to Hoda because she was no longer engaged in terrorist activity.

Preenforcement review is not a vehicle to settle questions of statutory interpretation unconnected with matters of constitutional right. Instead, preenforcement review is limited and appropriate only to relieve a plaintiff from the necessity of "first expos[ing] himself to actual arrest or prosecution" before he can "challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The district court properly rejected Muthana's standing to seek review of the applicability of the material support statute absent a claim of constitutional right.[13] Accordingly, we affirm the dismissal of this count for lack of subject matter jurisdiction.

* * *

Muthana focuses his lawsuit on the hardship resulting

---

[13] For the first time on appeal, Muthana argues that the material support statute unconstitutionally burdens his right to free association. Because it is "not the province of an appellate court to hypothesize or speculate about the existence of an injury Plaintiff did not assert to the district court," we decline to consider this new theory of standing on appeal. *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (cleaned up).

from the revocation of his daughter's passport and the State Department "stripping away" her citizenship. Yet Hoda was not born a United States citizen because her father possessed diplomatic immunity when she was born and therefore she was not born subject to the jurisdiction of the United States. *See* U.S. CONST. amend. XIV, § 1. Hoda's son, who was born abroad to two non-citizen parents, could not have acquired citizenship. *See* 8 U.S.C. § 1401(g). Therefore, we affirm in part the grant of summary judgment to the government because neither Hoda Muthana nor John Doe have ever been citizens of the United States. We also affirm the district court's dismissal for lack of jurisdiction of Muthana's claim for preenforcement review of the material support for terrorism statute. Because the district court lacked jurisdiction over Muthana's petition for a writ of mandamus, it must be dismissed on remand.

*So ordered.*

TATEL, *Circuit Judge*, concurring in the judgment: Although this case touches on a critical provision of the Fourteenth Amendment—the "Jurisdiction Clause"—it could have been resolved on the most routine of grounds. Both parties agree that this dispute turns on when the United States Mission received "notification" of Ahmed Ali Muthana's termination from his role as a diplomat with the Yemeni Mission to the United Nations. If the United States Mission received that notification before Muthana's daughter's birth in October 1994, she is a citizen of the United States; otherwise, she is not.

The record contains two documents purporting to speak to Muthana's diplomatic tenure: a 2004 letter from Russell Graham stating that Muthana was "notified to the United States Mission" as a diplomat from October 15, 1990, to September 1, 1994, and a 2019 letter from James Donovan stating that Muthana and his family possessed diplomatic immunity until February 6, 1995. But as even this court agrees, Majority Op. at 21–22, nothing in the Graham letter contradicts the Donovan letter's statement that the United States received notification of Muthana's termination on February 6, 1995. We therefore could have easily resolved this case on the ground that there is no genuine issue of material fact as to the date of notification, just as the government argued in the district court, just as Judge Walton concluded, and just as the government urges here. Indeed, we could have done so by judgment.

Yet the court reaches out to affirm on the basis of an argument not raised by the government and not surfaced by the court at oral argument: that we must ignore the Graham letter entirely and look to the contents of the Donovan letter alone because that is the document the executive branch "formally" transmitted to the court in the course of litigation. Such a holding is not only unnecessary, but wrong.

The court begins its analysis with "a century of binding precedent that places the State Department's formal

certification of diplomatic status beyond judicial scrutiny." Majority Op. at 19. So far so good. Over a century ago, the Supreme Court announced in *In re Baiz*, 135 U.S. 403 (1890), that because "we do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister," "the certificate of the Secretary of State . . . *is the best evidence* to prove the diplomatic character of a person." *Id.* at 432, 421 (emphasis added). Were the Donovan letter the only State Department certification in the record, that uncontroversial statement of law would make this an even easier case.

The problem, of course, is that the record contains not one but two documents purporting to be certifications. Both the Graham and Donovan documents appear on the letterhead of the United States Mission, carry the United States seal, and bear the signature of the Minister Counselor for Host Country Affairs. Both, moreover, contain the same opening words: "This is to *certify that* . . . ." Joint Appendix 12, 18 (emphasis added). Based on only the four corners of the two documents, both would appear to qualify as the "best evidence to prove the diplomatic character of a person."

The court sidesteps the problem of dueling certifications by describing the Donovan document as a "formal certification to the Judiciary" submitted to the court pursuant to a "longstanding process." Majority Op. at 21–22. But the court never explains why the Donovan document, and not the Graham document, is "formal" despite both bearing the same indicia of institutional legitimacy. Nor does the court point to any evidence, record or otherwise, that a longstanding formal procedure for communicating the Executive's view of diplomatic status to the court exists. Instead, it simply *assumes* that the way such information reached the court in a handful of prior cases reflects a longstanding formal procedure. But those

decisions describe only the facts before the court in each, not any formal procedure.

Without saying so outright, the court appears to adopt a novel rule: that the term "certification" somehow refers only to a "formal certification to the Judiciary" submitted by the Executive in connection with litigation. Majority Op. at 22. That rule suffers from two major flaws.

First, the government nowhere advances the court's theory—not in its brief and not at oral argument. *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."). To be sure, as my colleagues observe, Majority Op. at 22 n.10, the government does contend that the Donovan letter was "conclusive" and "dispositive." Appellees' Br. 30–31. But the government does not contend that the Donovan letter was the sole "certification," and thus "dispositive," *by virtue of* the Executive submitting it to the court during this case. The court nonetheless claims to divine such an argument from the government's statement that "when the Department of State certifies the diplomatic status of an individual, the courts are bound to accept that determination." Majority Op. at 22 n.10. That statement, however, says nothing about what makes one document and not another a "certification"—the critical question here—and certainly says nothing to suggest that submission during the course of litigation is dispositive. The government simply declares that the Donovan letter "ends the factual inquiry into Plaintiff's diplomatic status at the time of [his daughter's] birth," Appellees' Br. 25–26, before going on to argue that the Graham letter "failed to . . . refute th[e] date" contained in the Donovan document, *id.* at 31. I think it especially unwise to adopt a rule

that turns on government submission of a document when the government itself advances no such rule.

Second, no case supports the court's new rule. Although the court seeks to house its theory in *In re Baiz*, 135 U.S. 403 (1890), and *Carrera v. Carrera*, 174 F.2d 496 (D.C. Cir. 1949), neither case speaks to how a court differentiates between two seemingly authentic State Department documents. To be sure, the Court held in *In re Baiz* that "the certificate of the Secretary of State . . . *is the best evidence* to prove the diplomatic character of a person." 135 U.S. at 421 (emphasis added). But in that case, the Court rejected the petitioner's claim to immunity because there was no certification at all, so the question of submission was not before the Court. And in *Carrera*, the plaintiff challenged the only purported certification on the ground that it was submitted *ex parte* and therefore "not properly presented to the District Court." 174 F.2d at 497. Rejecting that argument, our court held that "the process by which the claim of immunity . . . was communicated to the court" was proper. *Id. Carrera*, in other words, suggests that a court can consider a State Department certification (which, per *In re Baiz*, is the "best evidence" of diplomatic status) no matter how that certification makes its way to the district court. Nothing in either opinion suggests that submission by the government during litigation somehow elevates one authentic State Department document over another; the issue was just not before either court.

Nor do decisions citing *In re Baiz* and *Carrera* address the issue of dueling documents. In *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328 (11th Cir. 1984), for example, the Eleventh Circuit relied on a State Department certification and rejected the argument that it should conduct an independent inquiry into whether the individual fell outside the protections of the Vienna Convention, or "was apparently eligible for, but

had not been granted diplomatic status at the time he initiated [suit]." *Id.* at 1331. In *United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004), the Fourth Circuit likewise concluded that, having been presented with a "State Department[] certification . . . based on a reasonable interpretation of the Vienna Convention," the court would "not review the State Department's factual determination that, at the time of his arrest, Al-Hamdi fell outside of the immunities of the Vienna Convention." *Id.* at 571, 573. Neither case addressed the question we face here: what to do when there are two state department documents purporting to address diplomatic status.

Of course, our review is limited in this sensitive arena. Article II of the Constitution gives the President the power to "receive Ambassadors and other public Ministers," which is precisely why the Supreme Court crafted the "best evidence" rule in *In re Baiz*: to prevent the judiciary from "sit[ting] in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister." 135 U.S. at 432. Nothing in the Constitution or case law, however, requires that we credit the Executive's litigating position to the exclusion of all other Executive evidence, no matter how authoritative.

Under the court's new rule, had Muthana produced a document identical to Donovan's letter in every way except for stating "this is to certify that the United States Mission received notification not in February 1995, but in July 1994," it would have been improper to even *consider* that evidence. The case law does not require such a result, the government does not seek it, and we can straightforwardly resolve this case on the same ground Judge Walton did—that "the Graham certification . . . speak[s] to the date of [Muthana's] termination . . . , not the date when the United States Mission was *notified* of [his]

termination." *Muthana v. Pompeo*, No. 19-cv-00445, slip op. at 21 (D.D.C. Dec. 17, 2019).